McLure et als. v. Colclough et als.

~~~~~~~~~~

McLURE et als. *vs.* COLCLOUGH et als.

1. It is not a good cause to strike an answer from the file, that it omits the name of one of the defendants in the title of the case, nor that it is interlined in a material part, unless it appears that the interlineation was made after the answer was sworn to, or some other irregularity intervened.

2. When one of the allegations of a bill is that a sheriff's bond was "never received or approved" by the County Court Judge—delivery being essential to a complete and effectual acceptance, proof of such delivery is not irrelevant to the issue tendered by the allegation.

3. An actual delivery of a deed is not essential.   A delivery good in law may be made by mere words, or by such words and actions as indicate an intention that the deed shall be considered as executed.

4. Where the name of P., one of several intended sureties, is affixed to a bond under an authority which the other sureties have at the time an opportunity of examining, and all is done that was contemplated to render the bond effectual, in the absence of fraud, they cannot claim exemption from liability, because the authority is defective and insufficient to bind P.

5. The power of a Judge of the County Court to accept and approve the

7

bond of a sheriff is derived from and defined by law. The validity of his official acts, therefore, cannot be affected by his negligence or mistake in the performance of an act not within the scope of his official duties.

Error to the Chancery Court of Barbour. Tried before the Hon. Joseph W. Lesesne.

BUFORD, for plaintiffs.

BELSER, HARRIS and CAMPBELL, for defendants.

PARSONS, J.—The bill was filed in chancery by McLure, Cooper, Brown, Dansby and Campbell; by the first three as alleged securities of Duncan McRea, as sheriff of Barbour county, and by the last two as sureties of McLure in a writ of error bond, the object of which was to remove the judgment against the sureties, which will be presently mentioned, to the Supreme Court, where the judgment was affirmed. For reasons stated in the bill, McRae, the sheriff, is made a defendant, and also Pugh, another supposed surety of his. But Colclough is the principal defendant. It appears by the bill that he had recovered a judgment in the Circuit Court of Pike, against certain persons—that he had caused a fi. fa. from his judgment to be placed in the hands of McRae, as sheriff of Barbour, which McRae had failed to return duly to the Circuit Court of Pike: That Colclough for this failure had ruled McRae in the Circuit Court of Pike and had recovered, by motion under the statute, a judgment against McRae, as sheriff, and against McLure, Cooper, Brown and Pugh as the supposed sureties of McRae, but that this recovery was had without any notice to sureties, and that therefore they could not and did not defend.

The bill and amended bill allege that McLure, Cooper and Brown were not sureties of McRae; because, as is alleged, the supposed official bond of McRae, though signed by them, was never delivered to or received by the Judge of the County Court of Barbour, who was Alexander McCall, as the final act and deed of the parties. And upon this ground the complainants seek an injunction to restrain Colclough from proceeding against them under his judgment at law. At the hearing the chancellor dismissed the bill, and the complainants have brought the cause here by writ of error.

McLure et als. v. Colclough et als.

This cause was here on a former occasion, when several questions were settled, but leaving others which are now to be decided.—See McLure et al. v. Colclough et al. 5 Ala. R. 65.

There are, in the first place, three preliminary questions to be disposed of. The complainants moved, in the court below, that Colclough's answer be taken from the file, because the answer omitted, in the title of the cause, the name of the defendant Pugh, but the motion was overruled. We cannot see that there was any error in overruling the motion. Nor can we see, in the next place, that there was error in refusing to take the answer from the files, because it had been interlined in a material part, before it was filed—it not appearing to us that it was interlined after it was sworn to, or otherwise improperly.

The third and last of these questions relates to so much of the deposition of Judge McCall as tends to prove that the sheriff's bond was delivered, and which ought to have been excluded, as is contended. Those depositions were taken between the times of filing the original and the amended bills. It is now contended by the counsel of the complainants, that the fact of the delivery was not put in issue until it was done by the amended bill, the original bill not having alleged that the bond was never delivered. But it is alleged in the original bill that the County Court Judge never received or approved of the bond. Now this was a very material allegation, and it is to be considered whether there is not such necessary connection between the facts of delivering and of receiving and approving, as that proof of the first is some evidence of the two last. If it is, the evidence of the delivery of the bond was not altogether foreign to the issue presented by the original bill, as to the facts of the receiving and approval of the bond. It is true that the judge might have received or obtained possession of the bond, without its having been delivered to him, but it is not perceived how he could have received and approved it effectually, unless it had been delivered. It may be said, we think, that a delivery is part of an effectual acceptance of a deed, which last cannot be without receiving and approving. Ordinarily, it includes them both. As the original bill presented an issue as to the facts of receiving and of approving, by denying both, the fact of delivery would tend to prove both of the facts. It would show the nature and object of receiving the bond, and these were evi-

dence of approval. The dissenting opinion of Chief Justice' Marshall in the case of The Bank of the U. S. v. Dandridge, 12 Wheat. 90, contains at least one proposition of law, which is evidently correct. He observed—"All admit that delivery is essential to the validity of a deed, and that acceptance is essential to a complete delivery." True as this is, it is equally so that delivery is essential to a complete and effectual acceptance. And for this reason we think that evidence of the delivery was not irrelevant to the issue presented by the original bill, and consequently it is our opinion that there was no error in refusing to exclude or suppress it.

Coming now to the merits of the cause, it is to be observed that the complainants have, by their bill and amended bill, stated a proper case for relief in equity; because they have fairly denied the validity of the bond, and it has been held here that a sheriff's sureties, in such a case, may be relieved in equity against a judgment at law taken by motion under the statute, without notice to them.

The question first arising upon the merits relates to the delivery of the bond. A delivery is issential, and it is to be considered whether the facts and circumstances of this case do not constitute a delivery in legal estimation.

The County Court Judge was the proper person to receive and approve the bond. Another officer may do this in certain cases, under the statute, but they do not arise in the present cause. It appears by the deposition of Alexander McCall, and by other evidence, that he was Judge of the County Court of Barbour county, during the time which is material in this investigation. It appears by the evidence also that he was on the bench holding a court, at the time McRae and his sureties, except Pugh, came into the court room to execute the official bond. It is evident from the proof that they came in for that purpose, and that they there signed the bond and that the seals had been previously affixed, or that they were then affixed by the parties. It appears, however, by the depositions of John H. White, which were not suppressed, (who was not made a party to this suit, although he was one of the sureties,) that McRae had informed him that the bond would be in the penalty of about ten thousand dollars, but that when he found it was in the penalty of thirty thousand dollars, he was disappointed and

remarked to McRae that he ought to get more sureties—that McRae then mentioned that Pugh was to be one of his sureties, and spoke of his wealth. This was just before the bond was signed. The witness states that he made no further objection, but that he had understood that Pugh was wealthy, and he intended that Pugh should be bound if he was. He states, further, that after all had signed, not seeing Pugh, he enquired for him. To this Judge McCall replied, as White states, that he was authorised to sign for him, by which the witness understood that the judge was authorised to sign for Pugh, so as to bind him, though it does not appear that the judge said so. White does not state that he told McRae that he would not execute the bond, unless it should be executed by Pugh, but he states the fact that he was disappointed in respect of the amount of the bond, and told McRae that he ought to get other sureties, to which McRae replied in reference to Pugh, as already mentioned. There is nothing to show that any part of this conversation was heard by Judge McCall, or that White's feelings of disappointment, or his intention not to bind himself unless Pugh should become bound, were made known to McCall. It is to be infered that this conversation took place in the court room, but it is more than probable that it was private, or in a low voice, as the court was sitting and it was not, so far as appears, addressed to the court. But White states that after all had signed the bond, except Pugh, he enquired for Pugh, when Judge McCall replied that he was authorised to sign for him. It is to be infered from the evidence that this was in presence of and heard by all the sureties; and it appears by one of the depositions of McRae, that he thinks that Cooper and McLure also enquired for Pugh. He states that he understood, and supposes the rest understood, that Pugh was to be bound before the bond would be approved, but he does not say that any one said so. It appears by the depositions of Judge McCall that he was in possession of a written instrument, in the handwriting of Pugh, in the following words :

"IRWINTON, Dec. 29th, 1837.

"A. McCALL: You are at liberty to sign my name to Duncan McRea's bond, as sheriff, if I am not at Clayton when he gives it.             Yours respectfully,

F. W. PUGH."

Judge McCall deposes that under this instrument, in the presence, as he believes, of all who signed the bond, he signed Pugh's name to it for him. It appears by the depositions of McRae, that when White enquired for Pugh Judge McCall held up a small piece of paper, which he said authorised him to sign for Pugh.

It is left in doubt, we think, by the evidence, whether McCall signed Pugh's name in presence of McRae and all his sureties, except Pugh, or after they or most of them had left. According to McCall's best recollection, they were all present, and in this we think he is in some degree supported by McRae in one of his depositions. But according to the deposition of White and one of the depositions, (the second,) of McRae, it must have been after White and others had left. We can see nothing to impugn the good intentions of any of the witnesses. Each one deposed, no doubt, according to his recollection at the times of deposing. But it further appears by the depositions of McRae, that after all had signed, unless the judge had not yet signed Pugh's name, and on the same occasion, the judge told him he had done with him; that he might take the oath of office before a justice of the peace and go to business as sheriff, and it is plainly to be infered from the evidence that he did so. It appears further by the depositions of McCall, that he would have accepted the bond without Pugh's name being in it—and that, as it was, he accepted the bond as a good bond and filed it in the office as the official bond of McRae, having considered it as delivered to him by their having given it to him to sign Pugh's name to it, and that he did this without knowing of any condition whatever on which it was executed, except the conditions expressed in it. But without going more into the particulars of the evidence, we believe that the following facts are established :

1. That McRae and his sureties, except Pugh, assembled together and went into the court room for the purpose of executing his official bond.

2. That upon arriving there and finding the bond prepared, White was disappointed in regard to the amount of the bond, and thereupon told McRae that he ought to get other sureties.

3. That McRae then mentioned Pugh as a surety, with whom White was satisfied, and that the sheriff and his sureties, except Pugh, then executed the bond.

4. That White, and probably others of the sureties, called for Pugh.

5. That Judge McCall then exhibited his authority from the bench, which all might have examined.

6. That all were then satisfied.

7. That the sureties severally withdrew, after McCall, under that authority, had signed Pugh's name to the bond, or just before, in expectation of his doing so.

8. That he did thus sign for Pugh before they left or just after, and on the same occasion, without his being aware of their leaving.

9. That this was all that Judge McCall or any of the parties required, and that upon this execution they all considered the bond as complete, except what is hereafter to be said in reference to McCall and Pugh.

10. That McCall, at the time the bond was executed by him and others, was mistaken himself as to the validity of his authority, and that he was guilty of no fraud whatever.

11. That McCall would have approved the bond if Pugh's name had never been mentioned; and that he was not aware, when he approved it, of any condition on which any of the parties executed it, except the conditions expressed on its face, as emphatically stated in his deposition.

12. That McRae, with the consent of all the parties, commenced and continued upon the discharge of his official duties, no one doubting but that the bond was executed in the name of Pugh, by McCall, under the authority which was exhibited and which all might have examined.

13. That neither McCall nor any of the obligors in the bond looked to any further act to be done to render the bond effectual, except as hereafter mentioned, in reference to McCall and Pugh.

According to this evidence, without now bringing into view what is hereafter to be stated, it is conceived that the bond was received and approved by the County Court Judge. It was left on the table below his seat, in his presence, for him, and for no other person or purpose. It was left for him upon no condition or expectation, or only in the expectation that he would execute it in the name of Pugh, under the authority which had been exhibited. If left upon no condition or expec-

tation, which is probable, then it was left as the bond of the parties who actually executed it, and this was a delivery in law. Skelton's case is so brief that we may state it in its own words. It may be found in Cro. Eliz. 7. The case was this, "Lessee for years grants his term by deed, and sealeth it in presence of divers, and of the grantee himself; and the deed at the same time was read, but not delivered, nor did the grantee take it; but it was left behind them in the same place.

"The opinion of all the justices was, that it was a good grant; for the parties came for that purpose and performed all that was requisite for the perfecting it, except an actual delivery; but it being left behind them and not countermanded, it shall be said a delivery in law." The deed or bond in the case at bar was left on the clerk's table, in the presence of the judge, in the expectation and understanding that it was complete and approved, or that this would be the case when the judge should execute it in Pugh's name, under the authority which had been exhibited, and which, we believe from the evidence, was done before they left, or immediately afterwards, and before Judge McCall was aware that they had left. We think that in effect it was done in their presence and with their approbation, and consequently that it was a perfect deed; it being evident that the judge approved of it as such.

Then, although there was no delivery by the hand, there was enough to constitute a good delivery in law. This may be accomplished by mere words, or by such words and actions as indicate a clear intention that the deed shall be considered as executed; as when a party to an instrument seals it, and declares, in presence of a witness, that he delivers it as his deed, but keeps it in his own possession, and there is nothing to qualify that, or to show that the executing party did not intend it to operate immediately, except the keeping of the deed in his hands, it is a valid and effectual deed; and actual delivery to the party who is to take by the deed, or to any person for his use, is not essential.—Doe on Dem. Garnors v. Wright, 5 B. & C. 671.

We therefore think, that as all the parties intended to execute the bond finally on that occasion, and that as Judge McCall signed for Pugh, under the authority he exhibited, at the same time and in the presence of all the parties, or very soon after they left, without his having observed it, and as neither the

judge nor any of the parties required or expected any thing further, the bond is valid and effectual according to the facts already stated, (Seymore v. Van Slyck, 8 Wend. 414,) unless it should appear that they are not bound in consequence of the invalidity of the authority under which McCall signed Pugh's name. That leads to further consideration.

It is very clear that Pugh was never bound, because the authority he gave was not under seal. It is contended by the counsel of the defendants, that as McCall sent a citation to Pugh to come and acknowledge the bond, and that as Pugh never dissented to the execution of the bond in his name by McCall, under the parol authority, he thus sanctioned it and became bound. · But it is not our understanding of the evidence of Judge McCall that he had personal knowledge that the citation was served, and there is no evidence of the fact in the record. Nor is it clear that if he had been served with such a citation, and paid no attention to it, that he would have become bound thereby.

It cannot be said that this bond is void, because its execution was procured by fraud, for we are well satisfied there was no fraud: Nor was it executed upon any condition, except, in the language of the witness, the conditions expressed therein: Nor was it executed by the sureties who signed upon the faith and understanding that it was to be executed by Pugh personally, or by any one else. If that had been the case, the transaction would have been incomplete until all had signed. These suggestions will distinguish the case at bar from various cases to be found in the books. The case at bar was one in which all was done that was expected, and done in the mode expected. It was final. At the moment of the execution of the bond, the judge and all the parties believed it to be valid. He believed so because as yet it had not occurred to him that his authority was of doubtful validity, and the others chose to take it for granted that the authority was good. Having neglected to examine it, when they had a clear opportunity to do so, and having chosen to take the chances of its validity, whatever they might be, they must now be held to their position. . They cannot be permitted, in a business transaction, to close their eyes and ears, and then claim advantage of all they did not see and hear. The people, for whose benefit the bond was taken, had

no opportunity to examine the authority under which Judge McCall acted as the agent of Pugh. Those who trusted when they might by ordinary prudence have saved themselves ought to bear the loss. As well might a surety claim to be discharged, in the absence of fraud, because he had subsequently ascertained that his co-surety was insolvent or an infant. As well might a partner, who had undertaken to bind himself and his co-partners by a bond, claim to be discharged, because, contrary to the opinion of himself and all the parties, they were not bound.

It was the official duty of Judge McCall to take the bond for the benefit of the public. If, therefore, he was not a proper person to be agent for one of the sureties, they are all chargeable with knowledge of the fact. But in that matter he did not assume to act as Judge of the County Court, but as agent of Pugh, under an authority, such as it was, which he exhibited. If he may assume such a character, certainly it is distinct from his official character. In the one case he receives his power from an individual, in the other from the law. His powers under the law are precisely defined and well known. That of signing for a co-surety is not among them, and this the parties must all have known. In that matter they knew he was acting out of the range of his official duties, and merely as the agent of Pugh. Hence his acts as agent must have the effect of similar acts by any other agent, and nothing more. It is a mistake to suppose that he, as a private agent, can by negligence or misunderstanding in the line of his duties as such, affect the validity of his official acts. Then, in respect to the other sureties, the ineffectual attempt to bind Pugh is the same in effect, as if another person instead of the judge had been the agent. In that case the sureties, in the absence of fraud, who execute the bond in person, cannot be discharged, because another was not legally bound, in consequence of a defective authority, it being exhibited at the time.

We come now to a particular consideration of the evidence relating to the approval of the bond, and we admit that it is not free from difficulty.

Judge McCall, in his first deposition, states that it was his intention before writing his approval on the bond to let Pugh acknowledge it in person; that although he would have accepted

and approved the bond without Pugh's name, yet as his name was on it, he thought he ought not to endorse his approval until he was fully satisfied that Pugh was bound; and that when he was about to approve the bond, or while he was writing Pugh's name, he recollected an objection of Judge Crenshaw to a similar bond, and concluded that before he could be satisfied it would be necessary to see Pugh. In his second deposition, he states that he "accepted the bond as a good bond and filed it in the office;" but he adds, that he concluded on reflection not to write the word *accepted* on the bond until he could see Pugh and get him to acknowledge the signature. He states further, that he notified Pugh by citation to appear before him for the purpose of obtaining his acknowledgment, but that Pugh did not appear. He also made an unsuccessful personal effort, with the same view. It was his habit, he says, to write the word *approved* or *accepted* on official bonds with which he was satisfied; but recollecting that Judge Crenshaw had objected to a bond under similar circumstances, he says that immediately after signing Pugh's name, and before leaving the office, he concluded not to write the word *approved* on it until he could see Pugh. These depositions, when read separately, convey different impressions. The first deposition seems to negative the idea of approval; the second does not establish it conclusively, but strongly tends that way. And yet, when considered together, as explanatory of each other, the inconsistency is rather apparent than real, and the result seems to be, that the bond was in fact approved: For it must be observed, that the first deposition does not fix the precise point of time at which the judge concluded that the acknowledgment of Pugh was necessary. It states, in the alternative, that "when he was about to approve the bond, *or* while he was writing Pugh's name, he recollected the objection of Judge Crenshaw," and that *then* he concluded he would get the acknowledgment before approval. If we adopt the first alternative—the time when he was about to approve the bond—as the point of time at which he concluded to obtain the acknowledgment, the two depositions may be reconciled with each other, and the question of approval will then turn upon the construction to be given to the last deposition.— Confining ourselves, then, to the second deposition, we think that when regarded as a whole it must be considered as showing

that there was a point of time, however short, when the bond was accepted and deemed satisfactory to the judge. We admit that we do not arrive at this conclusion without some difficulty; for, from his statement that it was his habit to write the word *accepted* on bonds with which he was satisfied, connected with his omission to write his approval on this bond, the inference would seem to arise that he had not approved it. But we are led to believe that a fair construction of the whole deposition will repel this inference. He states expressly, that *he accepted the bond as a good bond and filed it in the office;* and he adds, "but on reflection, I thought I would not write *accepted* on it until I could see Pugh and get him to acknowledge his signature." From this statement, it is quite obvious that his *reflection* was subsequent in point of time to the filing of the bond; and if he accepted it and filed it, it was not necessary to its validity, as this court decided when the case was here before, that the acceptance should be manifested by any matter of record or by writing. —5 Ala. 72. In another part of the same deposition, he states that he would have written *approved* on the bond, "but it struck him the same day it was signed, immediately after signing Pugh's name and before he left the office," that Judge Crenshaw had objected to a similar bond, and "for that reason he would not approve it until he could see Pugh, or write the word *approved* on it." The word *immediately* is of relative signification, and is never employed to designate an exact portion of time. It is used with more or less latitude by universal consent, according to the subject to which it is applied; and, as here used, it may well consist with the fact that the bond had been filed before his doubts originated. It is true, he says that on account of his doubt he would not approve the bond until he could see Pugh, and if this stood by itself, it would be conclusive that he never did approve it. But if we take the entire statement—"that he would not approve it until he could see Pugh, or write the word approved on it"—we think that the latter words were added for the sake of expressing his meaning more clearly; and this was, most probably, that he concluded to postpone the written evidence of his approval until he could see Pugh. If this were his meaning, and he had previously accepted the bond, we have seen already that no written evidence of approval was necessary. But there are still further statements in the deposition, requiring

less minuteness of criticism, and tending very strongly to show that there was a period or point of time at which the bond was fully approved. He states, that " he filed the said bond in the office of the clerk of the County Court of Barbour county, as the official bond of said McRae ;" and again he says, that "he filed the said bond in the County Clerk's office, and *considered* it the official bond of said McRae, but, on reflection, had doubts of its validity without acknowledgment." It is difficult from this language to resist the conclusion that he had in fact accepted the bond, and that his doubts were subsequent to his acceptance. *Reflection*, according to common usage, refers to past time, and although it may be properly used with reference to present time, we think we would not be justified in considering it so used in the present instance. The fair and natural import of other expressions used in the same deposition controls its meaning, and indicates the intention and understanding of the witness.

We think that the conclusion at which we have arrived as to the approval of the bond is strengthened by other evidence in the case. It is distinctly stated by Judge McCall, that he considered the other securities sufficient, and that he would have accepted and approved the bond without Pugh's name. From this it may be fairly inferred that his anxiety to get Pugh's acknowledgment was, not to make the bond a valid bond, but to bind one of the securities more firmly. It was, moreover, his duty by law, if he considered the bond insufficient, to require a good and sufficient one to be executed. His not requiring another bond would argue very strongly that he was satisfied with the one which he had filed. But he expressly states, that he did not require a new one, because he considered the one in question to be good. The deposition of the sheriff, McRae, also goes a great way to show that the bond was approved. He says, "after the bond was signed, I asked the judge if he was through with me, and said something about my official oath, when he said I could take it before a magistrate—he was through with me—that after I filed my affidavit I could enter upon the duties of the office of sheriff. He signified that he was rather dissatisfied with Pugh at his absence, and that he wanted him to come and acknowledge his liability on the bond." We can give no other construction to this statement of the sheriff, than that the bond was actually approved, and that the remark of the judge as

to Pugh's absence was intended only to convey the idea that he, as one of the securities, ought to be more firmly bound.

The amended bill is not sustained by the evidence. We have not found it necessary to consider the questions of competency of witnesses, or whether or not some of the depositions were correctly suppressed, because, if it were clear that all the witnesses were competent, and all the depositions admissible, still our opinion would be the same.

Let the decree be affirmed.